UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| BETTY S. SHEW, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 4:12-CV-1219 (CEJ) |
| | ) |
| CAROLYN W. COLVIN, Commissioner of Social Security, | ) ) |
| | ) |
| Defendant.[1] | ) |

## MEMORANDUM AND ORDER

This matter is before the Court for review of an adverse ruling by the Social Security Administration.

## I. Procedural History

On February 3, 2009, plaintiff Betty S. Shew filed an application for a period of disability and disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401 *et. seq.*, (Tr. 133-140), with an alleged onset date of January 31, 1998. After plaintiff's application was denied on initial consideration (Tr. 54-63), she requested a hearing from an Administrative Law Judge (ALJ). See Tr. 65-70 (acknowledging request for hearing).

Plaintiff and counsel appeared for a hearing on September 30, 2010. (Tr. 32-53). The ALJ issued a decision on December 10, 2010 denying plaintiff's application. (Tr. 15-24), and the Appeals Council denied plaintiff's request for review on May 10, 2012. (Tr. 1-4). Accordingly, the ALJ's decision stands as the Commissioner's final decision.

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013, and should be substituted for Michael J. Astrue as the defendant in this suit. No further action need to be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. §405(g).

## II. Evidence Before the ALJ

### A. Disability Application Documents

In her Disability Report (Tr. 156-168), plaintiff listed her disabling conditions as cyclic cushings disease, severe high blood pressure, chest pain, migraine headaches, joint, back and neck pain, memory problems, fatigue, and tremors. She stated that when she experiences migraine headaches she can lose vision for up to an hour and that exhaustion and pain make it very difficult for her to accomplish tasks. Plaintiff wrote that she is a self-employed artist who approximately works four hours per day for two days a week. She stated that she has been unable to work full time since 1980 because of her pain, lack of stamina, and stress from art shows. In her Work History Report (Tr. 171-178), plaintiff listed her past work as book shelver, artist, and house cleaner.

In her Appeals Disability Report (Tr. 184-196), plaintiff added heart attack, atrial fibrillation, flutter, and three blocked arteries to her list of medical conditions, all of which she attributed to her high blood pressure. She wrote that she was suffering from stabbing left side neck pain, memory lapses, and difficulty reading. She claimed that the pain from her atrial fibrillation causes her to be completely nonfunctional. She further stated that she forgets to brush her teeth, has to be reminded to take and order medicine, has trouble cooking and grocery shopping, and cannot take care of her home. She claimed that she was no longer working.

### B. Hearing on September 30, 2010

At the time of the hearing, plaintiff was 56 years old. Plaintiff testified to earning an associates degree in graphic arts. (Tr. 32). She testified that Dr. Sandra Hoffman, M.D. was her primary care physician between her onset date of January 31, 2008 to

-2-

September 30, 2002, the date she was last insured. Plaintiff stated that Dr. Hoffman treated her for hypertension, medication side effects, acid reflux, and fatigue. (Tr. 34-36). Plaintiff claimed that she began to suffer from depression "in the last few years" as a result of being constantly sick. (Tr. 35, 50). Plaintiff stated that she suffered side effects from her medications, which included nausea, vomiting, and headaches. (Tr. 46-47).

The ALJ referenced one of Dr. Hoffman's treatment notes, which stated that plaintiff was working long hours in December of 2001. Plaintiff testified that the note was inaccurate. (Tr. 35-36). The ALJ referenced another of Dr. Hoffman's notes which stated that plaintiff injured her elbow in December 2009 while playing in a family football game. Plaintiff testified that she threw the ball once, but was not participating in the game. (Tr. 36-37). The ALJ asked plaintiff why she waited until November 2003 to see a hypertension specialist. Plaintiff testified that she could not remember. (Tr. 37-38).

Plaintiff testified that between January 31, 2008 and September 30, 2002, she suffered from high blood pressure, severe headaches, ocular migraines, dizziness, nausea, overall physical pain, chest pain, blurry vision, fatigue, and tremors. (Tr. 39-42, 44). Plaintiff claimed that she used to be an active person, but slowly became unable to take care of her home, grocery shop, cook, and sometimes had difficulties driving. (Tr. 42). Because of her fatigue she often slept 9 to 11 hours a day. (Tr. 43). Plaintiff further testified that she suffered from shortness of breath when she attempted to do activities like climbing stairs or lifting items. (Tr. 44).

Plaintiff explained that she worked part-time in a retail position for one year but could not handle the hours or lift heavy boxes. (Tr. 45-46). She then worked as a

-3-

house cleaner, but had to quit because one day of work would cause her severe pain for the rest of the evening and the following day. (Tr. 46). Plaintiff further testified that her family tries to market and sell her artwork for money. (Tr. 46-47). Plaintiff claimed that she cannot maintain full-time employment because her conditions prevent her from working at least one to two days a week. (Tr. 49).

### D. Medical Evidence

On February 4, 1998, Jamie Nobbe, R.P.T., a physical therapist at St. Anthony's Medical Center, saw plaintiff for an initial evaluation for right hip pain. (Tr. 418-422). On March 17, 1998, plaintiff completed her first round of physical therapy. (Tr. 409-410). On April 27, 1998, Ms. Nobbe wrote that plaintiff's physical therapy goals were not accomplished because plaintiff did not return for any office visits subsequent to the March 17th appointment. (Tr. 410).

On October 8, 1998, plaintiff saw Dr. Hoffman for enlarged lymph nodes under her left arm, which Dr. Hoffman attributed to shaving. (Tr. 235). On November 30, 1998, plaintiff saw Dr. Hoffman for a routine physical and breast exam. (Tr. 324-235). On April 26, 1999, plaintiff complained of painful lymph nodes underneath both arm pits and cervical chain and tenderness of the abdomen. Dr. Hoffman ordered an ultrasound and noted that plaintiff's blood pressure was "suddenly 178/110." (Tr. 234). This was the first note of high blood pressure in the record.

On November 23, 1999, Felice A. Rolnick, M.D., a colleague of Dr. Hoffman, wrote that plaintiff's hypertension was a recent development and that plaintiff was not tolerating the original medication. He stated that plaintiff had "a history of [] side effects from all kinds of meds [and she] does not like to take meds." (Tr. 232). On December 15, 1999, plaintiff saw Dr. Hoffman with complaints of right elbow pain.

-4-

Plaintiff explained that the injury was caused from her attempt to throw a football at a family game. (Tr. 232). On January 24, 2000, plaintiff saw Dr. Hoffman for a follow up regarding her high blood pressure and arthritis. During this appointment her medications were adjusted and Dr. Hoffman wrote that "anxiety may be a component of her blood pressure as it has gone up and down at different times." (Tr. 231). On May 1, 2000, plaintiff saw Dr. Hoffman for a full physical. Plaintiff's EKG and chest x-ray produced normal results. Plaintiff complained of left sided chest pain and increased fatigue. (Tr. 230).

On May 9, 2000, plaintiff had a cardiac ultrasound with mostly normal results, mild mitral regurgitation and trace tricuspid regurgitation. (Tr. 242). On May 12, 2000, David Dobmeyer, M.D. performed a cardiac catheterization and renal angiography and concluded that plaintiff had severe systemic arterial hypertension, normal left ventricular hemodynamics and systolic function, minimal atherosclerotic disease, and normal bilateral renal angiography. (Tr. 241).

On July 10, 2000, plaintiff saw Dr. Hoffman for a follow up appointment. Treatment notes record the presence of a lump in plaintiff's right breast. Dr. Hoffman wrote that plaintiff's blood pressure was controlled on Maxzide, but that she complained it made her nauseated. (Tr. 230). On November 13, 2000, plaintiff saw Dr. Hoffman for a hypertension follow up. Treatment notes state that plaintiff "has been intolerant to many meds with vague and unusual symptoms." On December 19, 2000, plaintiff underwent a CT scan of her brain due to complaints of headaches. The results were normal. (Tr. 255).

On September 7, 2001, plaintiff told Dr. Hoffman that she had been experiencing dizziness for two weeks with mild nausea. Treatment notes state that she previously

suffered from these symptoms and that they could be the result of fall allergic rhinitis. Her blood pressure during the appointment was high at 158/102, which Dr. Hoffman thought could be related to her complaints of dizziness. (Tr. 229). On December 19, 2001, plaintiff returned to Dr. Hoffman for a routine physical examination. Treatment notes state that plaintiff was an "artist who works long hours and recently has developed hypertension which is difficult to control." (Tr. 228).

On January 11, 2002, plaintiff underwent an ultrasound of the retroperitoneum with attention to the kidneys. The results were normal. (Tr. 253). On February 20, 2002, plaintiff saw Dr. Hoffman with complaints of significant fatigue. Dr. Hoffman wrote that plaintiff has "poorly controlled hypertension, but each time [she tries] to start some med [plaintiff] has difficulty with it." (Tr. 227). On March 20, 2002, plaintiff returned to Dr. Hoffman for a follow up appointment. Her blood pressure was 184/102. Again, Dr. Hoffman wrote about plaintiff's inability to tolerate medication and the unusual difficulty of controlling her hypertension. (Tr. 227).

On December 18, 2002, testing on plaintiff's right breast lump was negative for cysts. On December 30, 2002, plaintiff saw Dr. Hoffman for another routine physical examination. Dr. Hoffman wrote that plaintiff had been exhibiting "extremely labile blood pressure" over the last year and significant fatigue. Dr. Hoffman further stated that plaintiff saw Dr. Mennes, a nephrologist, who prescribed Catapres Patches II to be used weekly, but that plaintiff could not tolerate higher doses. Dr. Hoffman also stated that plaintiff could not tolerate other prescriptions and that she "has a history of very unusual side effects with multiple blood pressure medications." (Tr. 226-227).

-6-

The record also contains medical reports from 2003 to the end of 2010. However, because these records extend beyond the date plaintiff was last insured, it is unnecessary to include them in this discussion.

## III. The ALJ's Decision

In the decision issued on December 10, 2010, the ALJ made the following findings:

1.  Plaintiff last met the insured status requirements of the Social Security Act on September 30, 2002.

2.  Plaintiff did not engage in substantial gainful activity during the period from her alleged onset date of January 31, 1998 through her date last insured of September 30, 2002.

3.  Through the date last insured, plaintiff had the following severe impairments: hypertension and side-effects of anti-hypertensive medications.

4.  Through the date last insured, plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5.  Through the date last insured, plaintiff had the residual functional capacity to perform the full range of sedentary work as defined in 20 C.F.R. 404.1567(a).

6.  Through the date last insured, plaintiff had no past relevant work performed at the level of substantial gainful activity.

7.  There are other jobs plaintiff could perform which existed in significant numbers in the national economy.

8.  Plaintiff was not under a disability, as defined in the Social Security Act, at any time from January 31, 1998, the alleged onset date, through September 30, 2002, the date last insured.

(Tr. 15-24).

## IV. Legal Standards

The district court must affirm the Commissioner's decision "if the decision is not based on legal error and if there is substantial evidence in the record as a whole to

-7-

support the conclusion that the claimant was not disabled." Long v. Chater, 108 F.3d 185, 187 (8th Cir. 1997). "Substantial evidence is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion." Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002) (quoting Johnson v. Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001)). If, after reviewing the record, the court finds it possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the court must affirm the decision of the Commissioner. Buckner v. Astrue, 646 F.3d 549, 556 (8th Cir. 2011) (quotations and citation omitted).

To be entitled to disability benefits, a claimant must prove she is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months. 42 U.S.C. § 423(a)(1)(D), (d)(1)(A); Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009). The Commissioner has established a five-step process for determining whether a person is disabled. See 20 C.F.R. § 404.1520; Moore v. Astrue, 572 F.3d 520, 523 (8th Cir. 2009). "Each step in the disability determination entails a separate analysis and legal standard." Lacroix v. Barnhart, 465 F.3d 881, 888 n.3 (8th Cir. 2006).

Steps one through three require the claimant to prove (1) she is not currently engaged in substantial gainful activity, (2) she suffers from a severe impairment, and (3) her disability meets or equals a listed impairment. Pate-Fires, 564 F.3d at 942. If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to steps four and five. Id.

"Prior to step four, the ALJ must assess the claimant's [RFC], which is the most a claimant can do despite her limitations." Moore, 572 F.3d at 523 (citing 20 C.F.R. § 404.1545(a)(1)). "RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities." Social Security Ruling (SSR) 96-8p, 1996 WL 374184, *2. "[A] claimant's RFC [is] based on all relevant evidence, including the medical records, observations by treating physicians and others, and an individual's own description of his limitations." Moore, 572 F.3d at 523 (quotation and citation omitted).

In determining a claimant's RFC, the ALJ must evaluate the claimant's credibility. Wagner v. Astrue, 499 F.3d 842, 851 (8th Cir. 2007); Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2002).  This evaluation requires that the ALJ consider "(1) the claimant's daily activities; (2) the duration, intensity, and frequency of the pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints." Buckner v. Astrue, 646 F.3d 549, 558 (8th Cir. 2011) (quotation and citation omitted).  "Although 'an ALJ may not discount a claimant's allegations of disabling pain solely because the objective medical evidence does not fully support them,' the ALJ may find that these allegations are not credible 'if there are inconsistencies in the evidence as a whole.'" Id. (quoting Goff v. Barnhart, 421 F.3d 785, 792 (8th Cir. 2005)).  After considering the seven factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which

-9-

caused the ALJ to reject the claimant's complaints. Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000); Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

At step four, the ALJ determines whether claimant can return to her past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. § 404.1520(e). The burden at step four remains with the claimant to prove her RFC and establish that she cannot return to her past relevant work. Moore, 572 F.3d at 523; accord Dukes v. Barnhart, 436 F.3d 923, 928 (8th Cir. 2006); Vandenboom v. Barnhart, 421 F.3d 745, 750 (8th Cir. 2005).

If the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. Banks v. Massanari, 258 F.3d 820, 824 (8th Cir. 2001). See also 20 C.F.R. § 404.1520(f).

If the claimant is prevented by her impairment from doing any other work, the ALJ will find the claimant to be disabled.

## V. Discussion

Plaintiff contends that the ALJ erred by (1) failing to recognize Cushing's syndrome as a severe impairment; (2) mischaracterizing the testimony and evidence to erode plaintiff's credibility; (3) incorrectly assessing plaintiff's residual functional capacity; (4) failing to give significant weight to plaintiff's treating physician; and (5) failing to obtain vocational expert testimony. (Doc. #11).

## A. Cushing's Syndrome

-10-

Plaintiff argues that the ALJ erred in determining that her Cushing's syndrome was a nonsevere impairment. Plaintiff acknowledges that her doctors did not diagnose the syndrome until 2003, six months after her last insured date. However, she argues that the syndrome's symptoms, including hypertension, were present between 1999 and 2002 and impaired her ability to work.

"A severe impairment is defined as one which significantly limits [the plaintiff's] physical or mental ability to do basic work activities." Martise v. Astrue, 641 F.3d 909, 923 (8th Cir. 2011). Considering the evidence in the record, including that which detracts from the ALJ's conclusions, the Court finds that there is substantial evidence to support the ALJ's decision regarding the severity of plaintiff's Cushing's sydrome between January 31, 1998 to September 30, 2002.

The record shows that plaintiff underwent physical therapy from February 4, 1998 to March 17, 1998. (Tr. 409-410). In October 1998 and April 1999, plaintiff saw Dr. Hoffman for enlarged lymph nodes. (Tr. 234-235). On April 26, 1999, Dr. Hoffman noted that plaintiff's blood pressure was "suddenly 178/110" and that plaintiff never had this issue before. (Tr. 234).  On January 24, 2000, plaintiff saw Dr. Hoffman for a follow-up regarding her high blood pressure and arthritis. (Tr. 231). On May 1, 2000, plaintiff saw Dr. Hoffman for a routine physical where plaintiff complained of left side chest pain and increased fatigue. (Tr. 230). On July 10, 2000, Dr. Hoffman wrote that plaintiff's blood pressure was controlled on Maxzide, but that it made her nauseated. (Tr. 230). On November 13, 2000, Dr. Hoffman wrote that plaintiff "has been intolerant to many meds with vague and unusual symptoms."  On December 19, 2000, plaintiff obtained a CT scan of the brain due to complaints of headaches. The results were normal. (Tr. 255).

On September 7, 2001, Dr. Hoffman attributed plaintiff's dizziness to fall allergic rhinitis. (Tr. 229). On February 20, 2002, plaintiff saw Dr. Hoffman with complaints of significant fatigue. (Tr. 227). On March 20, 2002, plaintiff returned to Dr. Hoffman for a follow up on her high blood pressure, which was 184/102 at the time of the appointment. Dr. Hoffman wrote about plaintiff's inability to tolerate medication and the unusual difficulty of controlling her hypertension. (Tr. 227). On December 30, 2002, plaintiff underwent another routine physical. Dr. Hoffman wrote that plaintiff had been exhibiting "extremely labile blood pressure" over the last year and significant fatigue. (Tr. 226-227).

The record reflects that plaintiff's primary medical issue during the relevant time period was her uncontrolled hypertension and blood pressure. The ALJ, at Step 2 of the sequential evaluation, determined hypertension to be a severe impairment. However, despite plaintiff's argument, there is a lack of substantial evidence to show that Cushing's syndrome was also a severe impairment or that her syndrome significantly limited her ability to work. See Johnson v. Astrue, 628 F.3d 991, 992-93 (8th Cir. 2011) (finding that plaintiff who had "been aggressively treated and occasionally hospitalized" for a specific condition was not disabled because she submitted no evidence that the condition rendered her unable to work). Accordingly, the ALJ did not err in his determination that plaintiff's Cushing's syndrome was nonsevere during the relevant time period.

## B. Plaintiff's Credibility

Plaintiff argues that the ALJ erred by mischaracterizing the hearing testimony and record evidence, which incorrectly made plaintiff appear evasive and not credible.

-12-

The Eighth Circuit has articulated the following factors for evaluating pain and other subjective complaints:

> (1) the claimant's daily activities; (2) the duration, intensity, and frequency of pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints.

Moore v. Astrue, 572 F.3d 520, 524 (8th Cir. 2009); Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). "The ALJ is not required to discuss methodically each Polaski consideration, so long as he acknowledged and examined those considerations before discounting [a claimant's] subjective complaints." Partee v. Astrue, 638 F.3d 860, 865 (8th Cir. 2011). The determination of a plaintiff's credibility is for the Commissioner, and not the Court, to make. Pearsall v. Massanari, 274 F.3d 1211, 1218 (8th Cir. 2001). The ALJ may disbelieve a claimant's complaints if there are inconsistencies in the evidence as a whole. Polaski, 739 F.2d at 1322. When an ALJ explicitly finds that the claimant's testimony is not credible and gives good reasons for the findings, the Court will usually defer to the ALJ. Casey v. Astrue, 503 F.3d 687, 696 (8th Cir. 2007).

In the instant case, the ALJ cited to Polaski and based his credibility assessment on: (1) plaintiff's inconsistent and evasive answers at the hearing; (2) plaintiff's five-year delay in filing a disability application; (3) plaintiff's failure to engage in substantial gainful activity throughout her lifetime; (4) plaintiff's failure to seek aggressive treatment for her complaints; (5) plaintiff's infrequency of seeking medical attention for her alleged disability; and (6) Dr. Hoffman's reports of bizarre, if not creative, responses to medication.

The ALJ is in a better position to analyze plaintiff's credibility at the hearing. See Casey v. Astrue, 503 F.3d 687, 698 (8th Cir. 2007). The fact that plaintiff testified that

-13-

her job as an artist was mostly therapeutic, while Dr. Hoffman recorded that plaintiff was "working long hours" in 2001, is a valid credibility consideration. Additionally, no treating physician imposed any exertional or other restrictions on plaintiff during the relevant time period. See Melton v. Apfel, 181 F.3d 939, 941 (8th Cir. 1999) (credibility can be undermined when there is a lack of significant restrictions placed on the plaintiff by treating physicians).

Furthermore, the medical records between January 31, 1998 and September 30, 2002 do not reflect aggressive treatment or hospitalization. In fact, plaintiff stopped seeing her physical therapist, despite continued pain, and primarily saw Dr. Hoffman for lymph node complaints, allergies, and routine physicals. Although Dr. Hoffman recorded a sudden onset of high blood pressure, plaintiff was treated with prescription medication. Dr. Hoffman affirmatively noted that the medication did control her hypertension, but that plaintiff persistently reported "vague" and "unusual" side effects. The record also shows significant gaps between doctor appointments. For instance, plaintiff did not see any health care providers between December 19, 2000 and September 7, 2001. See Siemers v. Shalala, 47 F.3d 299, 302 (8th Cir. 1995) (gaps in treatment undermine plaintiff's credibility). There is only one note during the relevant time period referring to headaches and a CT scan of the brain produced normal results. Lastly, the fact that plaintiff has not engaged in substantial gainful activity throughout her lifetime justifiably detracts from her credibility. See Pearsall, 274 F.3d at 1218 ("A lack of work history may indicate a lack of motivation rather than a lack of ability."). Altogether, this constitutes substantial evidence to support the ALJ's credibility determination.

## C. Residual Functional Capacity Determination

-14-

Plaintiff argues that the ALJ's RFC determination is conclusory and not supported by evidence. "The RFC 'is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities,' despite his or her physical or mental limitations." Roberson v. Astrue, 481 F.3d 1020, 1023 (8th Cir. 2007).  Although assessing a claimant's RFC is primarily the responsibility of the ALJ, some medical evidence must support the determination of the claimant's RFC, and the ALJ should obtain medical evidence that addresses his or her ability to function in the workplace. Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir.); Dykes v. Apfel, 223 F.3d 865, 867 (8th Cir. 2000); Roberson, 481 F.3d at 1023 (listing RFC factors, including medical history, effects of treatment, medical source statements, recorded observations, and effects of symptoms that are reasonably attributed to the medically determined impairment). Furthermore, if third parties, such as family, neighbors, or friends, submit descriptions or limitations regarding plaintiff's symptoms, those submissions must also be considered in the RFC assessment. 20 CFR § 416.945(a)(3).

The ALJ determined that plaintiff had the RFC to perform the full range of sedentary work as defined in 20 CFR 404.1567(a). The ALJ wrote that "the evidence indicates the claimant's functioning would be even less restrictive given the utter lack of consistent care prior to early 2003; however, the undersigned has given the claimant a slight benefit of the doubt and concluded a finding limiting the claimant to sedentary work is appropriate." A sedentary job "is defined as one which involves sitting[.]" 20 C.F.R. § 404.1567(a). "[A]n individual must be able to remain in a seated position for approximately 6 hours of an 8-hour workday, with a morning break, a lunch period, and an afternoon break at approximately 2-hour intervals." SST 96-9P, 1996 WL 374185, at *6.

-15-

      In arriving at this conclusion, the ALJ cited to the only physical RFC assessment in the record. (Tr. 22). Despite being completed by Kirk Sandfort, a state agent, the ALJ gave great weight to the assessment. Mr. Sandfort acknowledged that plaintiff was diagnosed with chronic reflux, moderate degenerative joint disease in lower back and right hip, and systemic arterial hypertension. However, Mr. Sandfort stated that there was "insufficient clinical evidence to document the severity of these conditions prior to the claimant's date last insured.  At the time plaintiff was last insured, she had high blood pressure, with some associated symptoms of dizziness. It is reasonable to assume at this time, she should have been restricted from hazards and heights[.]" (Tr. 434). The ALJ wrote that this was a "concise statement of the entire medical record."

      The ALJ acknowledged Dr. Hoffman's September 22, 2010 letter, which the ALJ described as a "medical source statement." (Tr. 22). In the letter, Dr. Hoffman confirmed her role as plaintiff's primary treating physician since April 13, 1990. Dr. Hoffman explained that plaintiff's "fatigue was so severe that she could hardly get out of bed, much less function for any period of time. Any activity was only for a few hours at a stretch and totally exhausted her[.]" Dr. Hoffman further discussed plaintiff's extremely severe hypertension, cardiac disease, and inability to work an eight hour day. Dr. Hoffman expressed her opinion that plaintiff has been fully disabled since April 13, 1990. (Tr. 823-824). The ALJ did not give significant weight to Dr. Hoffman's opinion.

      The Court finds that the ALJ's RFC determination is not supported by substantial evidence. A non-examining consultant's opinion alone is insufficient to support an ALJ's RFC determination and certainly falls short when contradicted by the opinion of a treating physician. See Jankins v. Apfel, 196 F.3d 922, 924-25 (8th Cir. 1999);

-16-

Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir. 2000) (opinions of those who have not examined the claimant ordinarily do not constitute substantial evidence on the record as a whole). Furthermore, none of the sources on which the ALJ relied suggest that plaintiff is able to sit for 6 out of 8 hours.

Defendant cites to Heavin v. Astrue, No. 4:10-cv-573 (E.D. Mo. Sept. 30, 2011) for the proposition that an ALJ can still determine a plaintiff's RFC despite the lack of medical evidence. The Court finds this case distinguishable. First, Dr. Hoffman submitted her opinion that plaintiff was disabled since 1990. Second, the minimal medical records available for the relevant time period does not describe the plaintiff's functional limitations "with sufficient generalized clarity to allow for an understanding of how those limitations function in a work environment." Id. (citing Cox v. Astrue, 495 F.3d 614, 619, n.6 (8th Cir. 2007)).

Lastly, the ALJ failed to take into account the descriptions and observations of plaintiff's limitations from the alleged impairments and symptoms provided plaintiff's sister, mother, and daughter. (Tr. 250-809).

Accordingly, after reviewing the ALJ's decision, the record, and the regulations and agency rulings defining sedentary work, the Court finds that remand is appropriate.

## D. Opinion of Sandra Hoffman, M.D.

Plaintiff further argues that the ALJ erred by failing to give significant weight to Dr. Hoffman, plaintiff's treating physician. In deciding whether a claimant is disabled, the ALJ considers medical opinions along with "the rest of the relevant evidence" in the record. 20 C.F.R. § 404.1527(b). The opinion of a treating source may be given controlling weight where it is well-supported by clinical and laboratory diagnostic

-17-

techniques and is not inconsistent with the record as a whole. 20 C.F.R. § 404.1527(c)(2). However, the ALJ "need not adopt the opinion of a physician on the ultimate issue of a claimant's ability to engage in substantial gainful employment." Qualls v. Apfel, 158 F.3d 425, 428 (8th Cir. 1998) (internal quotations and citations omitted).

The ALJ stated that he did not give significant weight to Dr. Hoffman's September 22, 2010 opinion regarding plaintiff's limitations. The ALJ pointed out that Dr. Hoffman's statement that plaintiff was disabled did not comport with her December 15, 1999 and December 19, 2011 notes reporting that plaintiff was playing football and working long hours. While "[i]t is permissible for an ALJ to discount an opinion of a treating physician that is inconsistent with the physician's clinical treatment notes[,]" Dr. Hoffman never wrote that plaintiff was playing football as the ALJ asserts. See Halverson v. Astrue, 600 F.3d 922, 931 (8th Cir. 2010). Instead, Dr. Hoffman wrote that plaintiff threw a football at a family game, which was consistent with plaintiff's testimony that she only threw the ball once and was not actually playing. (Tr. 36-37, 232). While the Court does acknowledge that the note stating that plaintiff was working long hours does not comport with being fully disabled, this is the only inconsistency apparent in the record.

The ALJ further wrote that Dr. Hoffman's "report is more consistent with an articulate and educated claimant attempting to convince the doctor her records were in error, and the doctor's affinity towards a claimant whose condition was difficult to diagnose." (Tr. 22). The ALJ did not point to any specific records or statements made by the plaintiff to support that she attempted to convince Dr. Hoffman that her

-18-

treatment notes were incorrect or any evidence that Dr. Hoffman expressed medical opinions based solely on "affinity."

The ALJ also stated that "[d]ue to the passage of time, Dr. Hoffman was apparently incapable of providing specific physical limitations as customarily requested by the law office representing the claimant." While it is true that Dr. Hoffman did not submit a physical RFC assessment or similar documents, there is no evidence in the record that she was incapable of providing a description of plaintiff's limitations during the relevant time period.

Accordingly, the ALJ improperly disregarded the treating physician's opinion and the Court finds that remand is appropriate.

## E. Vocational Expert Testimony

Plaintiff also argues that the ALJ erred by not obtaining vocational expert testimony despite the existence of her non-exertional impairments. See Lucy v. Chater, 113 F.3d 905, 908 (8th Cir. 1997) (if plaintiff possesses a non-exertional impairment the use of medical-vocational guidelines ("grids") is prohibited and vocational expert testimony is required). Because the Court has found error in the ALJ's RFC determination, it is unnecessary to address whether the ALJ incorrectly relied on the grids. Upon remand, the ALJ shall reassess his RFC determination and then determine at that time whether vocational expert testimony is required.

## VI. Conclusion

For the reasons discussed above, the Court finds that the Commissioner's decision is not supported by substantial evidence in the record as a whole.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **reversed** and this matter is **remanded** pursuant to the fourth sentence of 42 U.S.C. § 405(g) for further proceedings.

A separate Judgment in accordance with this Memorandum and Order will be entered this same date.

_____
CAROL E. JACKSON
UNITED STATES DISTRICT JUDGE

Dated this 1st day of July, 2013.